IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GOLDEN ARROW RESEARCH, LLC<br><br>Plaintiff,<br><br>vs.<br><br>ANCESTRY.COM DNA, LLC<br>d/b/a FOLD3<br><br>Defendants | Case No.   25-cv-00582 |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant Ancestry.com DNA, LLC d/b/a Fold 3's ("Defendant's") Motion to Dismiss for lack of personal jurisdiction should be **denied** because the tortious conduct of Defendant in intentionally infringing the copyright of Plaintiff Golden Arrow Research, LLC's ("Plaintiff's") uniquely targeted a business like Golden Arrow that is located in St. Louis, Missouri.

Plaintiff's business model is based solely and entirely on private individuals paying Plaintiff to visit the National Archives in **St. Louis, Missouri** and perform manual review, analysis, ands search of the documents there. **See Plaintiff's Exhibit 1.** Plaintiff's claim of copyright infringement – which claims that Defendant *verbatim reprinted* a blog post that was a core business offering, without attribution – is well founded in that the blog post is copyrightable subject matter, and Plaintiff registered the copyright. And, Missouri tort law allows a claim for trespass to chattels on the basis of misuse of intangible personal property.

I. **Plaintiff's business derived its entire economic value from its location in St. Louis, Missouri, where he had unique physical access to perform the often manually intensive work of reviewing materials held at the National Archives.**

A. The National Archives and Records Administration ("NARA") authorizes the retention of records relating to the movement of troops during World War 2 at its location at the National Personnel Records Center ("NPRC"), located at 1 Archives Drive, St. Louis, MO 63138.[1]

Among the billions of pages of records held by the National Archives and Records Administration (NARA), certain collections possess a unique power to illuminate the past on both a grand and a granular scale. The morning reports of the United States Army from the World War II era represent one such collection.[2] Far more than a simple administrative document, a morning report is a daily history of a military company or headquarters unit.[3] Its primary function was logistical: to track personnel and payroll by recording, as of midnight each night,

---

[1] Plaintiff moves the Court to judicially notice the contents of the below-cited federal government websites. *See* e.g. *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.,* 529 F. Supp. 3d 940, 959–60 (D.S.D. 2021) (Judicially noticing Internet Archive Wayback Machine).

[2] NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, *National Archives and Ancestry Sign New Agreement to Digitize and Publish Millions of Records*, NATIONAL ARCHIVES (May 8, 2024), https://www.archives.gov/press/press-releases/2024/nr24-27.

[3] Bryan Fitzgerald, *Morning Reports and Unit Rosters*, NATIONAL ARCHIVES (2016), https://www.archives.gov/files/calendar/genealogy-fair/2016/session-8-fitzgerald-presentation-handout.pdf.

the unit's strength and all changes in the duties and status of its personnel that occurred during the preceding 24 hours.[4]

The content captured in these reports is invaluable to historians, genealogists, and the families of veterans. On an individual level, the reports can contain a soldier's entire military career in miniature: dates of active duty, assignments, promotions, awards, detached service, arrests, and battle participation.[5] For a unit, the reports document its activation, movements, changes in command, and involvement in military maneuvers and campaigns.[6] For researchers, these records are often the only source to verify events or assignments not documented in an individual's Official Military Personnel File (OMPF), and they are instrumental in reconstructing the service history of veterans whose records were lost or destroyed.[7] Their purpose was administrative, but their enduring value is profoundly historical.[8]

Although the decision to digitize the records[9] authorized Defendant Ancestry.com to make copies of *the morning reports themselves* available to the public, it did not and could not authorize Defendant Ancestry.com to reproduce verbatim *analysis* of the publicly available content of those reports. The Federal Records Act

---

[4] NATIONAL ARCHIVES, *FOIA Information for Archival Records at the National Personnel Records Center (NPRC)*, https://www.archives.gov/personnel-records-center/foia-info (last visited Jul. 29, 2025).
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, *National Archives and Ancestry Sign New Agreement to Digitize and Publish Millions of Records*, NATIONAL ARCHIVES (May 8, 2024), https://www.archives.gov/press/press-releases/2024/nr24-27.

(FRA) mandates that federal records may not be destroyed or alienated except pursuant to the Archivist's approval. Specifically, the Archivist must determine whether records have "sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government" before authorizing their disposal.[10] The digitization of World War II morning reports and troop movement records falls within the Archivist's statutory and regulatory authority to preserve and make accessible records of historical value. These records likely meet the criteria for permanent preservation due to their informational and research value, as outlined in 44 U.S.C. § 3303a and 36 C.F.R. § 1220.18.[11] Moreover, the Archivist's role in facilitating public access to these records through digitization aligns with the statutory mandate to provide facilities and guides for their use.[12]

**But** this authority does not and cannot immunize Defendant Ancestry from deliberately and intentionally copying verbatim the *analysis* of those reports that was Plaintiff Golden Arrows core product.

> B. <u>Plaintiff's *Morning Reports* product at the time of the alleged infringement derived substantially all of its economic value from its close proximity to the NPRC because it allowed him to secure the reports in person and prepare a detailed analysis of the morning reports.</u>

Golden Arrow Research is a boutique archival and genealogical research firm specializing in U.S. military records from the 19th and 20th centuries. Their mission

---

[10] *Armstrong v. Bush*, 924 F.2d 282 (1991).
[11] See e.g. *American Friends Service Committee v. Webster*, 720 F.2d 29 (1983)).
[12] *Id.*

is "to help you achieve a deeper understanding of your heritage through our research services." *About Us*, GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/about/ (last visited July 29, 2025). They approach each project with "passion, determination and skill." *Id.*

Founder and President Geoff Gentilini created Golden Arrow Research in 2011 after successfully reconstructing his grandfather's lost WWII service record, which had been destroyed in the 1973 National Archives fire. *Family History Records Service*, GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/family-history-records-service/ (last visited July 29, 2025). Gentilini holds a Master of Arts in Military History from Norwich University and a Certificate in American Genealogical Studies, and he serves as President of the Archival Researchers Association. *Id.*

Golden Arrow Research provides the following services at present:

- Military Service Record Research based upon Official Military Personnel Files (OMPFs) for WWI, WWII, the Korean War, Vietnam, and even Civil War records. *Research a Veteran*, GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/research-a-veteran/ (last visited July 29, 2025).

- Use of morning reports, unit rosters, medical records, and after-action reports to reconstruct a veteran's service chronology, even when files were lost. *Id.*

- Genealogy and Family History, including family-tree construction, newspaper and courthouse research, DNA/genetic research, and ancestral homeland

tours. *Genealogy Research Service*, GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/genealogy-research-service/ (last visited July 29, 2025).

- Free initial consultations to tailor research scope and budget. *Research a Person*, GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/research-a-person/ (last visited July 29, 2025).

- Specialized Archival Retrieval through on site research at National Archives centers in St. Louis, MO; College Park, MD; and Washington, D.C., accessing non-digitized records daily. GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/ (last visited July 29, 2025).

- High-resolution scanning of original records and delivery of chronological PDF portfolios. *Order Service Records*, GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/order-service-records/ (last visited July 29, 2025).

- Research for Collectors and Historians through analysis of artifact provenance and context research for medals, dog tags, and militaria. *Testimonials*, GOLDEN ARROW RESEARCH, https://www.goldenarrowresearch.com/testimonials/ (last visited July 29, 2025).

- Collaboration case studies, e.g., tracing a WWI Purple Heart under General Patton in partnership with a militaria dealer. *Id.*

The business product for on site archival retrieval relies upon access every day to the National Archives location in St. Louis, MIssouri, ensuring faster, more thorough retrieval. *Id.* As an example, Golden Arrow Research for one client researched a purple heart recipient's WWI service and locating VA-claim-critical deck logs for Agent Orange exposure cases. *Id.* Endorsed by Medal Mulisha, a militaria collectibles organization, as "trusted by thousands of U.S. veterans' families." *Id.* Cited by professional researchers, e.g., author David Schwind recommends sending records requests to Geoff Gentilini for detailed service narratives. *Family History Records Service, supra.*

## II. Plaintiff's analysis of the Morning Reports meets all requirements for copyrightable subject matter, making the verbatim reproduction of the reports copyright infringement.

Under 17 U.S.C.A. § 106, the owner of a copyright has exclusive rights to reproduce, prepare derivative works, distribute, and publicly display their copyrighted work 17 U.S.C.A. § 106). For a blog post to be protected, it must meet the requirements of originality and fixation in a tangible medium of expression 17 U.S.C.A. § 101) Courts have consistently held that original creative works, including nonfiction writings, are protected by copyright, provided they contain original expression rather than mere facts or ideas *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985). For example, in Harper & Row Publishers, Inc. v. Nation Enterprises, the Supreme Court emphasized that verbatim copying of original language from an unpublished manuscript constituted copyright infringement unless

excused as fair use *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985).

In this claim, Plaintiff Golden Arrow alleges that Plaintiff created a an original video and blog post about the contents of, and method for analyzing, Morning Reports. Complaint at ¶ 13-14. Plaintiff maintains that this content was created as an entirely original work. *Id.* at 15. Defendant alleges that Defendant used a web scraper to verbatim copy his entire site. Complaint at ¶ 16. Following such copying, Plaintiff alleges that Defendant sent out his prepared analysis verbatim in support of their introduction of a product that made his unique access to the National Archives based upon his physical proximity to the records in St. Louis, Missouri. Complaint at ¶ 23.

These allegations, and Plaintiff's securing of the required registration prior to initiating suit, satisfies the low bar required to make plausible a claim for copyright infringement.

### III. **Allegations of copyright infringement are sufficient to establish personal jurisdiction over Defendant Ancestry because the alleged infringement, if proven, uniquely targeted a business like Plaintiff's that derived its economic value principally from its location in St. Louis, Missouri near the relevant national archives documents before their digitization.**

At the motion-to-dismiss stage, plaintiffs are required to make a prima facie showing of personal jurisdiction. This means that the plaintiff must plead sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the forum state. The evidentiary burden is minimal, and courts

generally require only a prima facie case to defeat a motion to dismiss for lack of personal jurisdiction.[13]

To establish personal jurisdiction based on tortious conduct, courts generally require the plaintiff to make a prima facie showing that the defendant's acts meet three criteria: (1) the acts were intentional; (2) the acts were uniquely or expressly aimed at the forum state; and (3) the acts caused harm, the brunt of which was suffered in the forum state, and which the defendant knew was likely to be suffered there.[14]

Here, the allegation is that the Defendant knowingly and deliberately reprinted verbatim a core document created by Plaintiff Golden Arrow that described uniquely and creatively the purposes, uses and applications of the Morning Reports. At the time, Defendant was introducing a product that directly capitalized on its unique authorization to reprint these digital records in a way that reduced a core offering of Plaintiff's business. Using Plaintiff's own work to do this was uniquely targeted at a business like Plaintiff's that derived its value primarily from its geographic location, and therefore was necessarily aimed at Missouri as a forum state.

## IV. Missouri state law authorizes a tort of trespass to chattels where there is an allegation of intentional conduct that interferes with the use or possession of intangible personal property.

---

[13] *ProMove, Inc. v. Siepman*, 355 F.Supp.3d 816 (2019).
[14] *Bruntjen v. Van Exel*, 506 F.Supp.3d 673 (2020).

Trespass to chattels involves intentional conduct that interferes with the use or possession of personal property in the possession of another without justification. This tort may be committed by intentionally intermeddling with a chattel, and the requisite intent exists when the act is done for the purpose of using or otherwise intermeddling with the chattel or with knowledge that such intermeddling will, to a substantial certainty, result from the act.[15]

Missouri courts have recognized that intangible personal property, such as internet domain names, can be subject to claims of trespass to chattels or conversion. For example, in *Missouri Ozarks Radio, Network, Inc. v. Baugh*, the court held that an internet domain name is a form of intangible personal property that can serve as the basis for a conversion claim. The unauthorized transfer of ownership credentials for a domain name was deemed an independent tort of conversion, separate from any contractual obligations.[16] Similarly, in Weicht v. Suburban Newspapers of Greater St. Louis, Inc., the court acknowledged that intangibles may qualify as personal property under statutes allowing recovery for trespass to property.[17]

---

[15] *Foremost Ins. Co. v. Public Service Com'n of Missouri*, 985 S.W.2d 793 (1998))
[16] *Missouri Ozarks Radio, Network, Inc. v. Baugh*, 598 S.W.3d 154.
[17] *Weicht v. Suburban Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592 (2000).

Respectfully Submitted,

**OTT LAW FIRM**

*/s/ Joseph A. Ott*
Joseph A. Ott, #67889
3544 Oxford Blvd
Maplewood, MO 63143
Phone: (314) 293-3756
Fax: (314) 689-0080
joe@ott.law
*Attorneys for Plaintiffs*